IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ANTHONY BUTLER,                          :
                                         :
    Plaintiff,                           :
                                         :        No. 5:21-CV-182 (CAR)
    v.                                   :
                                         :
JOSE ALBERTO CRUZ ADORNO,                :
CTS NATIONAL CORPORATION,                :
and ACE AMERICAN INSURANCE               :
COMPANY,                                 :
                                         :
    Defendants.                          :
_____         :

## ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY, MOTION FOR HEARING, AND MOTION TO STRIKE

Plaintiff Anthony Butler brings negligence claims against Defendants Jose Alberto Cruz Adorno and CTS National Corporation, and a direct-action claim against ACE American Insurance Company for injuries resulting from a collision involving two tractor-trailers. Currently before the Court are motions to exclude expert opinions from Plaintiff and Defendants. For the reasons explained below, Defendants' Motion to Exclude Opinions and Testimony of Plaintiff's Expert Adam Grill [Doc. 49] is **GRANTED in part and DENIED in part**; Plaintiff's Motion to Exclude Opinions of Defense Experts James Hrycay, P.E., and Nancy Grugle, Ph.D. [Doc. 46] is **DENIED**; Plaintiff's Motion for

Hearing [Doc. 47] is **DENIED**; and Plaintiff's Motion to Strike Declarations of James Hrycay and Nancy Grugle [Doc. 62] is **DENIED**.

## BACKGROUND

This action arises from the collision of two tractor-trailers. On May 5, 2019, around 11:14pm, Defendant Jose Alberto Cruz Adorno[1] rear-ended Plaintiff Anthony Butler.[2] At the time of the collision, Defendant Adorno was driving a 2011 Peterbilt tractor and hauling an empty tanker-trailer under dispatch for Defendant CTS National Corporation,[3] and Plaintiff was driving a fully loaded 2016 Volvo tractor-trailer under dispatch for UPS Ground Freight, Inc.[4]

After stopping at a Pilot Travel Center for a few hours, Plaintiff left and entered the on-ramp for Interstate 75 North.[5] It was dark, and the roads were dry.[6] As Plaintiff merged onto I-75 at exit 146 he noticed his tractor-trailer was not picking up speed.[7] It appears undisputed that a mechanical issue with the vehicle caused it to pick up speed slowly.[8] The exact speed Plaintiff was driving is in dispute. Defense expert James Hrycay opined

---

[1] In his deposition Defendant Adorno is identified using his first surname, "Cruz;" however, because the relevant motions identify him as "Adorno," that is how the Court will identify him.
[2] Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment [Doc. 52-1 at 4]; Plaintiff's Response and Brief in Opposition [Doc. 56 at 1].
[3] Defendants' Statement of Undisputed Material Facts [Doc. 52-8 ¶¶ 1, 3].
[4] Plaintiff's Complaint [Doc. 1 ¶ 5]; Doc. 52-8 ¶ 4.
[5] Plaintiff's Deposition Transcript [Doc. 51-2 at 66, 76].
[6] Adorno's Deposition Transcript [Doc. 46-7 at 108]; Doc. 51-2 at 77.
[7] Doc. 51-2 at 83, 84.
[8] James Hrycay's Expert Report [Doc. 46-1 at 36–37].

Plaintiff never exceeded 21.7 miles per hour.[9] Plaintiff denies he drove 21.7 miles per hour but admits he was going less than 40 miles per hour.[10] Plaintiff testified that by the time he noticed a problem with the truck's speed, Adorno had collided into the rear of his vehicle.[11] Thus, Plaintiff contends he had no time to activate his four-way flashers.[12] Defendant Adorno testified he was driving 65 miles per hour in the right lane of I-75 when he saw Plaintiff's vehicle in his lane of travel and attempted to avoid it, but could not.[13] The collision happened near mile marker 147, approximately half a mile to one mile from where Plaintiff entered the interstate.[14] Both men were transported to the hospital after the collision.

Plaintiff identified Adam Grill as an expert in trucking standards. He opines on federal regulations and general industry standards and practices related to trucking.[15] Defendants identified James Hrycay as an accident reconstruction expert. He opines on the circumstances surrounding the collision, including the movements of the vehicles and their mechanical condition.[16] Defendants also identified Nancy Grugle as a human factors

---

[9] *Id.* at 35.

[10] Plaintiff's Response to Defendants' Statement of Undisputed Material Facts [Doc. 60 ¶ 9]; Doc. 51-2 at 87.

[11] Doc. 51-2 168–69.

[12] Id.

[13] Deposition of Defendant Jose Alberto Cruz Adorno [Doc. 73 at 118].

[14] Doc. 51-2 at 82.

[15] Plaintiff's Response to Defendant's Motion to Exclude Expert Adam Grill [Doc. 58 at 6]; Adam Grill's Expert Report [Doc. 58-1].

[16] Defendants' Response to Plaintiff's Motion to Exclude Experts James Hrycay and Nancy Grugle [Doc. 59 at 1]; Doc. 46-1.

expert. She opines on the rate of closure of the vehicles and Adorno's perception and reaction time.[17]

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[18]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[19]

---

[17] Doc. 59 at 1; Nancy Grugle's Expert Report [Doc. 46-3].

[18] Fed. R. Evid. 702.

[19] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke County*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[20] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[21] Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[22] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[23]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[24] The trial court must also "'conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."[25] Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[26] In undertaking this analysis, the court must remember that the party offering the expert opinions has the burden of proof by a preponderance of the evidence.[27]

---

[20] 509 U.S. 579 (1993).

[21] *Id.* at 589 n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

[22] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); see also *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).

[23] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[24] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[25] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257).

[26] *See Daubert*, 509 U.S. at 591.

[27] *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[28] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[29] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[30] Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[31] Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[32]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[33] Certainly, an expert's scientific training

---

[28] *Daubert*, 509 U.S. at 592–93 & n.10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[29] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

[30] *See Kumho Tire*, 526 U.S. at 147.

[31] *McClain*, 401 F.3d at 1238 & n.2; *see Frazier*, 387 F.3d at 1260.

[32] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted); *see also McClain*, 401 F.3d at 1245 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2002)).

[33] *Frazier*, 387 F.3d at 1260.

or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[34] Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[35] In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[36]

Regarding, the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology can be applied to the facts in issue."[37] This inquiry must focus "solely on [the] principles and methodology [of the experts], not on the conclusions that they generate."[38]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[39] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those

---

[34] *Id.* at 1260–61.

[35] Santos v. Posadas de Puerto Rico Assocs. Inc., 452 F.3d 59, 63 (1st Cir. 2006).

[36] *Poulis-Minott*, 388 F.3d at 359.

[37] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592–92) (internal alterations omitted).

[38] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

[39] 509 U.S. at 593–94; *see also Goebel*, 346 F.3d at 992.

involving non-scientific experts.[40] Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[41]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[42]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[43]

---

[40] *See Kumho Tire*, 526 U.S. at 150–52.

[41] *Id.* at 151–52.

[42] Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

[43] See id.

Finally, for admission, the expert testimony must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[44] "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[45] Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[46] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[47] "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[48] Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'"[49]

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeping role . . . is not intended to supplant the adversary system or the role of the jury."[50] "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack

---

[44] *Frazier*, 387 F.3d at 1262.

[45] *Id.* at 1262–63.

[46] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[47] Id.; see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

[48] *Joiner*, 522 U.S. at 146.

[49] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[50] *Allison*, 184 F.3d at 1311.

by the opponent will go only to the weight of the evidence."[51] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[52] A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[53] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[54] But the court must ensure "each expert opinion . . . stay[s] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."[55]

## Part 1: ANALYSIS OF ADAM GRILL'S OPINIONS

Plaintiff's expert Adam Grill is a certified commercial vehicle operator, an active truck driver, and trainer and supervisor of truck drivers.[56] He has driven commercial motor vehicles professionally in forty-nine states.[57] Grill offers opinions relating to the Federal Motor Carrier Safety Regulations, the Georgia CDL Manual, general trucking industry standards and practices, and Defendants' duties and failure to comply with those

---

[51] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

[52] *Daubert*, 509 U.S. at 596.

[53] Quiet Tech. DC-8, Inc., v. Hirel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).

[54] *Frazier*, 387 F.3d at 1272.

[55] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

[56] Curriculum Vitae and Expert Report of Adam Grill [Doc. 58-1 at 36–37].

[57] *Id.* at 37.

duties. Defendants seek to exclude Grill's opinions because they are not the product of reliable principles and methods and will not assist the jury.

Grill has extensive knowledge about the trucking industry and its standards and practices, but six of his opinions must be excluded because: (1) the proffered opinions exceed the scope of his expertise, (2) his methodology is unreliable, and (3) the opinions go to the ultimate issue. Some of Grill's opinions, however, are admissible "to educate the factfinder on general principles."[58]

I.    Qualifications

Grill is not qualified to offer opinions related to the field of human factors or accident reconstruction. Grill admits that he is not a human factors expert and is not opining about a person's ability to perceive and react to stimuli.[59] Nor is Grill an accident reconstructionist.[60] Thus, Conclusions 3 and 4 are excluded. In Conclusion 3 Grill states:

> Defendant Adorno had a responsibility to adhere to industry regulations and standards in at least the following ways but failed to meet these standards as indicated in this report: Responsibility to see ahead; Responsibility to safely manage speed and space between his vehicle and other roadway users; Responsibility to recognize hazards and potential conflicts; Responsibility to operate with due caution as it relates to accident avoidance.[61]

---

[58] Fed. R. Evid. 702 advisory committee notes to 2000 amendments.

[59] Deposition of Adam Grill [Doc. 51-9 at 17, 18, 23, 66, 96].

[60] *Id.* at 22.

[61] Doc. 58-1 at 28.

In Conclusion 4 Grill states, "Defendant Adorno had the time and opportunity to see the hazards around him but failed to respond in a safe and reasonable manner."[62]

Human factors "is essentially the study of the 'interrelationship between human behavior or capabilities and the surrounding environment.'"[63] Grill has no scientific, technical, or other specialized knowledge that qualifies him to opine on Adorno's behavior or capabilities in relation to his environment. Grill uses his trucking knowledge to mask what are, in fact, human factors opinions. Thus, Grill may not opine on Adorno's ability to perceive and react to the hazards around him because those are human factors issues relating to Adorno's human capability to respond to stimuli rather than his discretionary actions.

## II.    Data and Methodology

Grill's Conclusions 1, 2, 3, and 4 must be excluded because they are not based on sufficient facts or data, are not the product of reliable principles and methods, and Grill did not reliably apply any methodology to the facts.[64] Grill admits that he has no data or calculations relating to the speed or time travelled by the vehicles and would defer to the electronic control module (ECM) data and other experts.[65] Grill's attempts to support the conclusions in his report with his deposition testimony fail, as it further exposes his

---

[62] Doc. 58-1 at 28.

[63] *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1350 n.20 (M.D. Ga. 2015) (citations omitted).

[64] Fed. R. Evid. 702 (b)–(d).

[65] Doc. 51-9 at 17, 23, 31, 32.

insufficient data and methods. Overall, Grill's opinions are conclusory and are not rooted in case-specific facts.

In Conclusion 1 Grill opines, "Defendant Adorno was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing into others but failed to apply such knowledge, skill, and attitude as indicated in this report."[66] In Conclusion 2 he states, "Defendant Adorno had a responsibility to apply defensive driving concepts like the Smith System but failed to do so."[67]

Grill fails to adequately explain the facts or data forming the bases of these conclusions. These conclusions amount to a declaration that because Adorno crashed into Plaintiff, Adorno must have erred. Grill explains that the collision occurred because Adorno was either inattentive or unable to "manage speed and space effectively," but he provides no specifics about how Adorno erred or what he could have done differently.[68]

Conclusions 3 and 4, identified in the previous section, are excluded for the same reasons. Grill insufficiently explains how Adorno failed to meet myriad industry standards. Further, Grill opines that Adorno had time to avoid the accident but provides no data to support that assertion.[69]

---

[66] Doc. 58-1 at 28.
[67] *Id.* at 28.
[68] Doc. 51-9 at 50.
[69] *Id.* at 59, 82–83.

Grill also has not "adequately accounted for obvious alternative explanations."[70] Grill testifies that Adorno's "specific textbook failures" in this case "indicate one of two things: Either a driver did something intentionally, or he had inadequate training that would prepare him for operating adverse to those issues."[71] But there are three obvious alternative explanations for Adorno's actions: (1) CTS adequately trained Adorno, who was nonetheless negligent; (2) Plaintiff was negligent; or (3) neither party was negligent because the accident was unavoidable. Grill does little to rule out these possibilities.

First, Grill's assumptions fail to account for the possibility that CTS adequately trained Adorno, who was nonetheless negligent. Grill concludes that Adorno, among other things, failed to manage his speed and space between the vehicles and failed to see ahead. He then assumes that these failures occurred because of CTS's inadequate training. Grill explains CTS's training is inadequate because it does not prepare drivers to stop within the distance they can see ahead, to manage their speed and space, or how to drive at night,[72] but the regulations he references for support do not specifically require the types of training for which he advocates.[73] Despite Grill's contention that Adorno's errors would have been "completely prevented" if CTS employed better training,[74] he provides no basis

---

[70] Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

[71] Doc. 51-9 at 49–50.

[72] *Id.* at 51.

[73] *Id.* at 53.

[74] *Id.* at 40.

for his assumption that additional training would have prevented this accident. Grill does not consider whether Adorno could have been negligent independent of CTS's actions, nor does he sufficiently explain why the training Adorno did receive was inadequate. To the extent Grill opines CTS inadequately trained Adorno, those opinions are inadmissible.

Next, Grill fails to address the possibility that Plaintiff was negligent in causing the accident. Grill states:

> Given the facts in this case, and the situation presented to the plaintiff, it is evident that [Plaintiff's] actions were consistent with what a reasonable CMV operator would have done in the same or similar circumstances. Therefore, since the plaintiff was faced with an *unexpected situation* and acted in a reasonably expected manner, no additional opinions or critiques were discovered.[75]

Grill explained further that the "unexpected situation" was the mechanical failure that caused the vehicle's inability to accelerate.[76] Grill's conclusion that Plaintiff acted reasonably is solely based on Plaintiff's testimony that by the time he recognized the mechanical failure, he had been struck.[77] Grill asserts that because "[Plaintiff's] actions would be deemed reasonable" regardless of the his training or condition, he had no need to further investigate Plaintiff's actions.[78] Grill gives Plaintiff the benefit of the doubt that he needed time to react to an unexpected mechanical failure, but he does not give the same

---

[75] Doc. 58-1 at 27 (emphasis added).

[76] Doc. 51-9 at 90.

[77] *Id.* at 55, 85.

[78] *Id.* at 55.

consideration to Adorno. Grill's opinions that Plaintiff had no time to react, whereas Adorno had the time but failed to do so lacks any supporting data—it is simply an assumption. His opinion has no quantitative data to support how much time either party had to react to their respective situations.[79]

Grill only applies the industry regulations and standards to Adorno, not Plaintiff. Grill opined that Adorno "failed to take proper precautions" to avoid the accident,[80] citing industry guidelines that "the professional driver should . . . take every reasonable measure to avoid involvement in an accident."[81] But Grill does not address whether Plaintiff took "every reasonable measure"[82] to avoid the accident. In addressing Plaintiff's failure to use his four-way flashers, Grill simply accepts Plaintiff's testimony that he did not have time without explanation[83] and fails to explain why Plaintiff should *not* have put his four-way flashers on when driving slowly on the highway at night.[84] When asked about Plaintiff's noncompliance with the CDL provision on driving slowly, Grill responded that "[e]verything is [] driver discretion, and it's really a case-by-case basis."[85] Grill finds that

---

[79] *Id.* at 82–83.

[80] Doc. 58-1 at 26.

[81] *Id.* at 23 (quoting American Trucking Associations' Guidelines for Determining Preventability of Accidents).

[82] *Id.* at 23.

[83] Doc. 51-9 at 63.

[84] *Id.* at 78, 94.

[85] *Id.* at 65. That provision states, "Drivers often do not realize how fast they are catching up to a slow vehicle until they are very close. If you must drive slowly, alert following drivers by turning on your emergency flashers if it is legal." Georgia Department of Driver Services, *2021-2022 Commercial Drivers Manual* § 2.5.1.

Adorno's failure to take precautionary measures must be the result of inadequate training, but Plaintiff's failure must be because of the unexpected situation with no explanation why Plaintiff's actions were acceptable when Adorno's were not.

In concluding that Plaintiff's actions were reasonable, Grill does not take into account whether Plaintiff should have realized that his vehicle had a mechanical problem sooner. Grill has "no opinion about" how long after diagnosis of a mechanical problem the driver should wait before putting on his flashers.[86] Grill recognizes that once a driver is aware of an issue that would require his communication with other drivers, like driving slowly on the interstate, he should attempt to on put on flashers.[87] But he accepts without analysis that it was reasonable for Plaintiff not to notice the mechanical issue before the collision.

Finally, Grill does not address the obvious alternative explanation, given this set of facts, that the collision was an unavoidable accident in which both drivers acted reasonably.

Overall, Conclusions 1–4 lack factual support and fail to apply facts to the regulations and standards he cites. His deposition further demonstrates his opinions lack supporting data and reliable methodology.

---

[86] *Id.* at 78.

[87] *Id.* at 77.

III. <u>Ultimate Issue</u>

Grill's Conclusion 5 and Conclusion 7 must be excluded because they impermissibly embrace the ultimate issue. In Conclusion 5 he states, "CTS is responsible for the actions of Defendant Adorno as it relates to the safe operation of a CMV."[88] In Conclusion 7 he states, "Defendant Adorno was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing into others but failed to apply such knowledge, skill, and attitude as indicated in this report."[89]

Although, "[a]n opinion is not objectionable just because it embraces an ultimate issue,"[90] an expert witness can "not tell the jury what result to reach."[91] Further, "the issue embraced must be a factual one."[92] "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."[93] Conclusions 5 and 7 are legal conclusions that go beyond the type of testimony an expert may offer. Grill masks these legal conclusions about Defendants' negligence as expert opinions thereby telling the jury what decision to reach.

---

[88] Doc. 58-1 at 28.

[89] *Id.* at 28.

[90] Fed. R. Evid. 704(a).

[91] *United States v. Duldulao*, 87 F.4th 1239, 1269 (11th Cir. 2023).

[92] *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

[93] *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted).

IV.    Education of the Factfinder on General Principles

Grill is allowed to testify about hazards of tractor-trailers pulling onto the shoulder of a road[94] and the proper use of four-way flashers,[95] as this type of information could help the jury and fits the facts of this case.[96] Similarly, explanations about the differences in operating a tractor-trailer and a personal motor vehicle and the types of training trucking employers provide their employees would be permissible. The jury will likely not be familiar with the operation of commercial motor vehicles, which is proper testimony that will assist the trier of fact.

V.    Conclusion

To summarize, the following opinions are excluded: Grill may not testify (1) that Adorno was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing into others but failed to apply such knowledge, skill, and attitude; (2) that Adorno had a responsibility to apply defensive driving concepts like the Smith System but failed to do so; (3) that Adorno had a responsibility to adhere to industry regulations and standards but failed to meet them by failing to see ahead, failing to safely manage speed and space between his vehicles and other users, failing to recognize hazards, and failing to operate with due caution; (4) that Adorno had the time and

---

[94] *See, e.g.*, Doc. 51-9 at 71–72.

[95] *See, e.g., Id.* at 78.

[96] *See* Fed. R. Evid. 704 advisory committee notes to 2000 amendments.

opportunity to see the hazards around him but failed to respond in a safe and reasonable manner;  (5) that CTS is responsible for the actions of Adorno as it relates to the safe operation of a CMV; or (7) that this collision was preventable on the part of CTS and Adorno.

### Part 2: ANALYSIS OF JAMES HRYCAY'S OPINIONS

Defendants' expert James Hrycay offers his opinions as an engineer and accident reconstructionist regarding the circumstances surrounding the collision. In general, Hrycay's opinions relate to: (1) the speed, distance, and time travelled by both vehicles, (2) collision avoidance, and (3) the mechanical condition of the tractor-trailer driven by Plaintiff. Plaintiff seeks to exclude Hrycay's opinions because they lack a reliable basis and are outside his area of expertise.

I.    <u>Qualifications</u>

Hrycay is qualified by his education, training, and experience to testify to the opinions outlined in his report. He is an engineer involved in the design of roadways and vehicles.[97] Hrycay received both his Bachelor of Applied Science and Master of Applied Science in Civil Engineering from the University of Windsor in Windsor, Ontario, Canada.[98] He is a member of numerous professional organizations, including the Society of Automotive Engineers (SAE) and the Institute of Transportation Engineers, and is a

---

[97] Deposition of James Hrycay [Doc. 46-2 at 8].
[98] Curriculum Vitae of James Hrycay [Doc. 51-4 at 1].

Designated Consulting Engineer by the Council of Professional Engineers of Ontario.[99] Hrycay has worked as an engineer for over 40 years and began specializing in accident analysis and transportation safety in 1982.[100] Hrycay has been a principal at HRYCAY Consulting Engineers since 1988.[101] He was previously a principal at N.K. Becker & Associates and a resident engineer at M.M. Dillon Ltd.[102] Hrycay has been involved in the investigation and/or engineering analysis of more than 4,700 motor vehicle accidents.[103] Hrycay has written and presented on motor vehicle accident investigation and analysis and traffic safety engineering in dozens of lectures and technical publications.[104]

Plaintiff argues some of Hrycay's opinions should be excluded because they are either truck driving, mechanical causation, or human factors opinions—not engineering or accident reconstruction opinions. The Court disagrees.

Plaintiff seeks to exclude Conclusion 20—Plaintiff should have realized there were mechanical issues before he merged onto the interstate. Plaintiff argues it (1) is a truck driving opinion, and Hrycay is not a truck driver; and (2) it would not assist the trier of fact. The Court disagrees. Conclusion 20 is based on his engineering knowledge and will assist the trier of fact.

---

[99] *Id.* at 1.

[100] *Id.* at 1–2.

[101] *Id.* at 1.

[102] *Id.* at 2.

[103] *Id.* at 2.

[104] *Id.* at 3–7.

In his report, Hrycay sufficiently explains the reasons for his opinion that Plaintiff should have realized the mechanical issues before merging,[105] and they do not specifically relate to trucking standards or truck driving. Hrycay used the Bendix Acom-Diagnostic Report, Volvo electronic control module (ECM) data, and the Volvo data imaging report generated by Delta-V Forensic Engineering to identify Diagnostic Trouble Codes (DTCs) that would have been triggered before the accident.[106] He then explains the meaning of the ten DTCs that were triggered before the accident and describes which dashboard lights would have been illuminated and where on the dashboard they are located.[107]

Plaintiff next seeks to exclude Conclusion 16 because it is a "mechanic causation opinion."[108] Hrycay states:

> The mechanical condition of the tractor resulting in the DTC faults, the warning lights, and the subsequent vehicle performance was the cause of Mr. Butler not being able to accelerate his vehicle up to highway speeds in the nearly ¾ of a mile he traveled before reaching the impact location. Otherwise, he was not attempting or using 100% throttle and making use of his available vehicle performance for the 1,790 feet of travel distance along the entrance ramp before the start of his vehicle speed versus time from where the Volvo ECM data begins.[109]

---

[105] Doc. 46-1 at 38.

[106] *Id.* at 10, 20, 26, 27.

[107] *Id.* at 27–31.

[108] Doc. 46 at 25.

[109] Doc. 46-1 at 32, 37.

Plaintiff argues this opinion on the mechanical cause of Plaintiff's slowly shifting truck should be excluded because Hrycay lacks experience in the relevant field, and he did not personally inspect the vehicle.

The Court disagrees. First, it is unclear what Plaintiff means by "the relevant field." Hrycay is an engineer and accident reconstructionist. Although his degree is in civil engineering, Hrycay has also taken graduate level courses and seminars on mechanical engineering and heavy trucks.[110] Hrycay opines on the mechanical cause of the vehicle's slow speed based on the DTC codes and uses his engineering expertise to explain the mechanics of the truck. Further, there is no bright line rule that an expert must inspect a vehicle in person, as long as his opinion is "based on sufficient facts and data."[111] Here, Hrycay did not need to personally inspect the vehicle to develop his opinions because he had access to the electronic data generated by the truck.

Plaintiff next seeks to exclude Conclusion 26 arguing it is a human factors opinion, for which Hrycay is unqualified, and it impermissibly goes to the ultimate issue of the case.[112] Hrycay opines:

> Mr. Adorno had both braked and steered left prior to impact in an evasive fashion indicating his perception-response to the Butler tractor trailer. At the end of Mr. Adorno's perception reaction the results of his decision

---

[110] Doc. 46-2 at 8–9.

[111] Fed. R. Evid. 702(b).

[112] Doc. 46 at 25. Plaintiff's Motion implies there are multiple human factors opinions in the report, but only identifies Conclusion 26. The Court does not find any of Hrycay's opinions are human factors opinions, and only addresses Conclusion 26 because that is the only one identified.

staring [sic] his evasive action began 1.5s to 1.9s and 134 to 169 feet before impact. Although he perceived and reacted the time and distance available for evasive action was insufficient for him to successfully avoid the slow moving Butler tractor trailer.[113]

Plaintiff argues this opinion consists of "factual conclusions extrapolated from the location opinions informed by 'human factors.'"[114]

But Conclusion 26 is neither a human factors opinion nor does it go to the ultimate issue. Hrycay's mention of the perception-reaction process is ancillary to the substance of his opinion. Hrycay does not opine about Adorno's human capability to perceive, respond, or react to the impending crash, or when he could or should have realized evasive action was necessary. Rather, he opines that based on the vehicles' speeds and their distance apart, it was physically impossible for Adorno to stop the vehicle in time to avoid a collision based on the time he began his evasive maneuver. The opinion is based on time and distance travelled and deceleration rates, not human factors concepts like looming[115] or perception-response time. Moreover, Conclusion 26 does not go to the ultimate issue—Hrycay does not opine Adorno was *unable* to perceive and react sooner and thus non-negligent. Instead, he opines that *because* Adorno did not perceive and react sooner, the accident was impossible to avoid. The jury will decide whether Adorno's

---

[113] Doc. 46-1 at 39.

[114] Doc. 46 at 26.

[115] "Looming" is a human factors concept referring to "[a] driver's ability to perceive a slower-moving vehicle ahead [as determined by] the driver's perception of the rate of closure between the two vehicles." Nancy Grugle's Expert Report [Doc. 46-3 at 3].

perception and reaction were negligently delayed. Finally, Conclusion 26 is not "common sense" as argued by Plaintiff. It is a synthesis of his calculations; not an opinion on reasonableness.

II.     Data and Methodology

Plaintiff argues the remainder of Hrycay's opinions should be excluded because the Google Earth and Google street view data he uses is unreliable.[116] Plaintiff argues Hrycay fails to identify scientific literature finding Google Earth is an acceptable tool for accident reconstruction,[117] and small inaccuracies in Hrycay's calculations could impact this case. Defendants respond that Google Earth is an accepted tool for accident reconstruction, and Plaintiff has not shown his calculations are unreliable. The Court agrees.

First, Google Earth and Google Earth Pro are effective tools for accident reconstructionists.[118] A technical paper published by SAE[119] concluded that "using Google Earth to obtain measurements is within an acceptable range of accuracy and is reliable for

---

[116] Doc. 46 at 14, 17

[117] *Id.* at 17.

[118] Jeffrey Wirth et al., Assessment of the Accuracy of Google Earth Imagery for Use as a Tool in Accident Reconstruction, SAE Technical Paper 2015-01-1435 1, 6 (2015), https://doi.org/10.4271/2015-01-1435; Shawn Harrington et al., Validating Google Earth Pro as a Scientific Utility for Use in Accident Reconstruction, SAE Int'l J. Transp. Safety 135, 142 (2017), https://doi.org/10.4271/2017-01-9750.

[119] "SAE is a global association of more than 128,000 engineers and related technical experts in the aerospace, automotive and commercial vehicle industries." SAE International Home Page, https://www.sae.org (last visited Mar. 12, 2024).

accident reconstruction purposes."[120] Expert opinions based on their data are routinely admitted.[121] Thus, the Court is not convinced by Plaintiff's challenge to the reliability of Hrycay's measurements due to his use of Google Earth. Based on the scientific literature, the Court finds it is more likely than not that Hrycay's calculations are the product of reliable principles and methods.

Next, the Court finds any inaccuracies in Hrycay's calculations go to the weight of the opinions, not their admissibility. Plaintiff compares one of Hrycay's calculations to one of Grugle's calculations to argue that inaccuracies in Hrycay's calculations "matter."[122] There is no doubt inaccurate calculations could impact the outcome of this case, but Plaintiff's argument on this point is confusing and unclear. As discussed above, Hrycay's methodology is sufficiently reliable, and he supports his findings with sufficient data. To the extent there are inaccuracies, Plaintiff may cross-examine Hrycay about them at trial.

### Part 3: ANALYSIS OF NANCY GRUGLE'S OPINIONS

Defendants' expert Nancy Grugle offers her opinions as a human factors expert. Grugle's opinions relate to the rate of closure between Plaintiff's and Adorno's vehicles

---

[120] Wirth *et al.*, *supra*, at 6.
[121] *See, e.g.*, *Fisher v. Bofford*, No. 2:18-cv-446-WKW-WC, 2019 WL 9050568, *6 (M.D. Ala. Dec. 4, 2019); *Sherwood v. United Parcel Serv., Co.*, No. 5:22-cv-499-CLS, 2023 WL 5807011, *4 (N.D. Ala. Sept. 7, 2023); *W-W Trailer Mfrs., Inc. v. Travelers Indem. Co.*, No. CIV-20-94-RAW, 2022 WL 493406, *1 (E.D. Okla. Jan. 4, 2022); *Union Pac. R.R. Co. v. Winecup Gamble, Inc.*, No. 3:17-cv-00477-LRH-CLB, 2023 WL 4053479, *10 (D. Nev. June 16, 2023); *Jordan v. Menjoulet*, No. 21-10643, 2023 WL 2746795, *10 (E.D. Mich. Mar. 31, 2023); *McChristion v. Sun Life Assurance Co.*, No. 1:21-cv-00332, 2022 WL 18107287, *6 (W.D. Tex. Oct. 24, 2022).
[122] Doc. 46 at 22.

and Adorno's perception and reaction time. Grugle earned a Bachelor of Science in Industrial and Systems Engineering from Ohio University, and a Master of Science and a Doctor of Philosophy in Industrial and Systems Engineering from Virginia Tech.[123] Grugle is qualified as a human factors expert, and Plaintiff does not challenge her qualifications.[124] Plaintiff seeks to exclude Grugle's opinions because they either lack a scientific basis, are the result of misapplied scientific principles, would not assist the jury, or go beyond her expertise.

Grugle's opinions are the result of reliable data. Plaintiff first seeks to exclude all Grugle's opinions because she uses two calculations from Hrycay he now claims he never generated.[125] But the only opinion that references those calculations is in Finding 2: "Adorno perceived and responded to Butler's slow-moving tractor-trailer in a reasonable amount of time." To reach Finding 2 Grugle used Hrycay's numbers as comparators; not in forming her own calculations. Although Grugle's conclusion in the report references the calculations Hrycay says he did not generate, her conclusion remains the same with the updated data.[126]

---

[123] Doc. 59-1 at 1.

[124] Doc. 46 at 8.

[125] Doc. 46-3 at 5; Doc. 46-2 at 69–70, 72.

[126] Plaintiff's Motion to Strike [Doc. 62] Hrycay's and Grugle's Declarations, which were attached as exhibits to Defendants' Response to Plaintiff's Motion to Exclude, is addressed in Part 4 of this Order.

The scientific literature Grugle relies on is reliable and fits the facts of the case. Plaintiff argues Grugle's opinions should be excluded because she was not personally involved in the studies she relies on, and those studies did not involve tractor-trailers or night driving.[127] Plaintiff cites no authority requiring an expert to be personally involved in the studies on which they rely, and the Court finds Grugle's lack of involvement in the study does not weaken its credibility or reliability. The study in question was published in a peer-reviewed journal, *Accident Analysis & Prevention*[128] ("Markkula study"). Further, contrary to Plaintiff's contention, the data sets used in the study included data from passenger cars, heavy trucks, buses,[129] and night driving.[130] As previously discussed, and as explained by Grugle, human factors involves the study of human capability, which is not enhanced merely because a person has received truck driving training. Especially relevant here, "looming is a psychological construct that applies to all drivers regardless of [the vehicle driven] . . . . because the perception of looming is a function of the human brain's inherent capabilities and limitations when processing information."[131] Regardless, the study cited includes bus and heavy truck drivers. Thus, Grugle's opinions are not excluded because of her reliance on the Markkula study. Any perceived issues with

---

[127] Doc. 46 at 12.

[128] Gustav Markkula et al., A Farewell to Brake Reaction Times? Kinematics-Dependent Brake Response in Naturalistic Rear-End Emergencies, 95 Accident Analysis & Prevention 209 (2016).

[129] Markkula *et al.*, *supra*, at 210.

[130] Deposition of Nancy Grugle [Doc. 39-1 at 67]; Doc. 59-1 at 4.

[131] Doc. 59-1 at 5.

Grugle's methodology go to the weight of the opinions—not their admissibility; and Grugle may be cross-examined on them at trial.

Plaintiff also argues Grugle's opinions are common knowledge and invade the province of the jury.[132] The Court disagrees. None of Grugle's opinions are common sense—they relate to the human factors concepts of looming and expectancy.[133] Although Grugle's opinions, specifically Finding 2, relate to reasonableness, the Court does not find they invade the province of the jury. Grugle's conclusion that "Adorno perceived and responded to Butler's slow-moving tractor-trailer in a reasonable amount of time,"[134] does not use "reasonable" to mean Adorno's actions were or were not negligent. Rather, Grugle's assessment that Plaintiff's actions were "reasonable" specifically relates to her calculations that he began evasive action within the time to be expected from a reasonably attentive driver travelling at the speed and distance the vehicles were. Grugle's testimony and calculations in her report provide sufficient context to show that she is not simply telling the jury what result to reach.[135]

Plaintiff's final objection is that Grugle's opinions are beyond her expertise because they relate to truck driving and how a tractor-trailer driver would be expected to react.[136]

---

[132] Doc. 46 at 9, 12.

[133] "Expectancy is the concept that drivers expect things to operate in a predictable way." Doc. 46-3 at 6.

[134] *Id.* at 7.

[135] *United States v. Duldulao*, 87 F.4th 1239, 1269 (11th Cir. 2023).

[136] Doc. 46 at 12–13.

The Court has addressed this issue throughout this Order but reiterates that the principles of human factors do not change because a person is a trained truck driver. Expectancy and looming apply to all drivers, so the Court will not exclude Grugle's opinions because the parties are truck drivers.

**Part 4: PLAINTIFF'S MOTION TO STRIKE DEFENSE EXPERTS' DECLARATIONS**

Plaintiff argues Hrycay's and Grugle's Declarations should be stricken because they are untimely expert reports not permitted by the Court's Scheduling Order.[137] Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless."[138] In *Miele v. Certain Underwriters at Lloyd's of London*,[139] the Eleventh Circuit held the district court did not abuse its discretion in denying the plaintiffs' motion to strike when the statements in the timely disclosed expert's report and late declaration were materially similar.

Although Hrycay's and Grugle's Declarations are more extensive than the late declaration was in *Miele*, the information they contain is "materially similar" to the information in their earlier reports.[140] Neither report reaches new conclusions. Grugle's

---

[137] Doc. 62 at 1–3.
[138] Fed. R. Civ. P. 37(c)(1).
[139] 559 F. App'x 858, 861–62 (11th Cir. 2014).
[140] *Miele*, 559 F. App'x at 861.

30

Declaration explains the ways Plaintiff's Motion to Exclude misunderstands her report and testimony using the same sources and language found in her original report and deposition. Although Hrycay's Declaration provides new references verifying the accuracy of his methodology and notes a subsequent visit to the accident site, none of his conclusions are altered. Moreover, the Court does not rely on Hrycay's site visit in finding his testimony admissible.[141] Therefore, the Court **DENIES** Plaintiff's Motion to Strike Declarations of James Hrycay and Nancy Grugle [Doc. 62].

## CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Exclude Plaintiff's Expert Adam Grill [Doc. 49], **DENIES** Plaintiff's Motion to Exclude Defendants' Experts James Hrycay, P.E., and Nancy Grugle, Ph.D. [Doc. 46], **DENIES** Plaintiff's Motion for Hearing [Doc. 47], and **DENIES** Plaintiff's Motion to Strike Declarations of James Hrycay and Nancy Grugle [Doc. 62].

**SO ORDERED,** this 27th day of March, 2024.

s/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[141] The Court reserves the decision of whether to allow Hrycay to testify about his site visit at trial for the pretrial conferences.